**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| WARREN GENERAL HOSPITAL, on behalf of itself and all others similarly situated | : : : : : |
| Plaintiff, | : : |
| v. | CIV. NO. 09-04935 (SRC-MAS) : : |
| AMGEN, INC. | : : |
| Defendant. | : : |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
AMGEN, INC.'S MOTION TO DISMISS THE COMPLAINT
AND STRIKE CERTAIN ALLEGATIONS IN THE COMPLAINT**

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................... 1

II.  STATEMENT OF FACTS ................................................................. 3

III. STANDARD OF REVIEW ................................................................ 7

IV.  LEGAL ARGUMENT ....................................................................... 8

    A.   Plaintiff Has Clearly and Properly Pled a *Per Se* Illegal Tying
       Claim Against Amgen. ............................................................... 8

    B.   Plaintiff and the Proposed Class Have Standing to Sue Amgen
       Because They Are Direct Purchasers of the RBCGF and WBCGF
       Drugs Under *Illinois Brick* .................................................... 19

        1.   Amgen and Plaintiff have a contractual relationship,
           and the existence of a GPO is inconsequential to
           Plaintiff's status as a Direct Purchaser ............................. 23

        2.   The presence of AmerisourceBergen as a wholesaler is a
           legal fiction serving only as an attempt to insulate Amgen
           from antitrust liability. ...................................................... 25

        3.   Amgen does not cite to any precedential case law to
           support its claim that Plaintiff is not a Direct
           Purchaser. ........................................................................ 31

        4.   Plaintiff has standing even if the Court finds that
           Plaintiff is an Indirect Purchaser, as the Cost-Plus
           Exception applies. ............................................................ 33

    C.   Amgen's Motion to Strike Plaintiff's allegations regarding the
       overcharge on the alleged tied product should be denied. ................ 35

V.   CONCLUSION ................................................................................. 38

# TABLE OF AUTHORITIES

## CASES

*In re AWP*, 491 F. Supp. 2d 20 (D. Mass. 2007) ........................................................27

*Allen-Myland, Inc. v. IBM*, 33 F.3d 194 (3d Cir. 1994) ........................................9, 10, 11, 12, 19

*Bristol-Myers Squibb Co. v. Ivax Corp.*, 77 F. Supp. 2d 606 (D. N.J. 2000) ..............................36

*Broadcom Corp. v. Qualcomm, Inc.*, 2006 WL 2528545 (D. N.J. Aug. 31, 2006) .....................18

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998)...9, 10, 11, 12, 19

*Caldwell Trucking PRP Group v. Spaulding Composites, Co., Inc.*, 890 F. Supp. 1247 (D. N.J. 1995) .......................................................................................................7

*Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) ...................... 16, 17, 19

*Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2006) ..............................................................................................32, 33, 34

*Doe v. Arizona Hospital and Assoc.*, 2009 WL 1423378 (Mar. 19, 2009, D. Ariz) ...................23

*Eisai Co., Ltd. v. Teva Pharmaceuticals USA, Inc.*, 629 F. Supp. 2d 416 (D. N.J. 2009) ...........36

*Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495 (1969) .............................................10, 12

*Gordon v. Lewistown Hosp.*, 423 F.3d 184 (3d Cir. 2005) .........................................9, 10, 12, 19

*Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir. 1993) ..............................................................................................................22

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) .........................20, 34

*Howard Hess Dental Labs, Inc. v. Dentsply Int''l, Inc.*, 424 F.3d 363 (3d Cir. 2005)................26

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ...............................................................passim

*Innovation Data Processing, Inc. v. IBM*, 585 F. Supp. 1470 (D. N.J. 1984)............................18

*In re Intelligroup Securities Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007) .......................................6

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 199 (1990) .......................................passim

*Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990)..............................................................20

*Link v. Mercedes-Benz of N.A., Inc.*, 788 F.2d 918 (3d Cir. 1986)...............................26

*Lojeski v. Boandi*, 602 F. Supp. 918 (E.D. Pa. 1984) ...................................................8

*McCarthy v. Recordex Service, Inc.*, 80 F.3d 842 (3d Cir. 1996), cert. denied, 519 U.S. 825 ...................................................................................................................................26

*Med Alert Ambulance, Inc. v. Atlantic Health System, Inc.*, Civ. A. No. 04-1615 (JAG), 2007 WL 2297335 (D. N.J. Aug. 6, 2007) ........................................9, 10, 11, 12, 19

*In re Mercedes-Benz Anti-Trust Litig.*, 364 F. Supp. 2d 468 (D. N.J. 2005) ............. 20, 22, 23, 26

*Merican, Inc. v. Catepiller Tractor Co.*, 713 F.2d 958 (3d Cir. 1983) .........................................26

*Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1978) ...........26

*Moore v. Thomas A. Mathews Co.*, 550 F.2d 1207 (9th Cir. 1977)...............................16

*Morgan Home Fashions, Inc. v. UTI, U.S., Inc.*, No. 03-cv-0772, 2004 WL 1950370 (D. N.J. Feb. 9, 2004) .....................................................................................................36

*Myers v. MedQuist, Inc.*, No. 05 CV 4608, 2006 WL 3751210 (D. N.J. December 20, 2006) ("Rule 8(e)(2) .........................................................................................................35

*N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1 (1958).........................................................................15

*Natchitoches Parish Hosp. Service District v. Tyco Int. LTD*, 247 F.R.D. 253 (D. Mass. 2008)...................................................................................................................................25

*Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145 (9th Cir. 2003) ............ 15, 16, 19

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) .................. 9, 10, 11

*Quinones v. U.S.*, 492 F.2d 1269 (3d Cir. 1974) .......................................................................8

*Sheet Metal Workers National Health Fund v. Amgen Inc.*, Civ. A. No. 07-5295, 2008 WL 3833577 (D. N.J. Aug. 13, 2008).................................................................... 35, 36, 37

*SmithKline v. Eli Lilly*, 575 F.2d 1056 (3d Cir. 1978) ..................................................... 8, 17, 18

*Sports Racing Services, Inc. v. Sports Car Club of America, Inc.*, 131 F.3d 874 (10th Cir. 1997)............................................................................................................................... 33, 34

*Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991) ..............................17

*Tonka Corp. v. Rose Art Indus.*, 836 F. Supp. 200 (D. N.J. 1993) ...............................................36

*Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir. 1992)................................................................................................................................... passim

*U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610 (1977)...................................................10

*U.S. v. Loew's Inc.*, 371 U.S. 38 (1962) .....................................................................................16

## STATUTES

Fed. R. Civ. P. 12(f) ...................................................................................................................35

Fed. R. Civ. P. 12(b)(6)................................................................................................................7

## MISCELLANEOUS

*"Tying, Bundled Discounts, and The Death of the Single Monopoly Profit,"* 123 Harv. L. Rev. 397, 449 (Dec. 2009) ...................................................................................................3

## I.    __INTRODUCTION__

Plaintiff Warren General Hospital ("Plaintiff") brings this action for unlawful tying under Section 1 of the Sherman Act and Section 3 of the Clayton Act against Defendant Amgen, Inc. ("Amgen") as a result of Amgen's scheme to improperly leverage and extend its monopoly power over its White Blood Cell Growth Factor ("WBCGF") drugs, Neulasta and Neupogen.  Amgen used its monopoly power in the WBCGF drug market to force Plaintiff and class members to purchase Aranesp, Amgen's Red Blood Cell Growth Factor ("RBCGF") drug, rather then is cheaper competitor.

Amgen was able to create its scheme because it knew: (1) its monopoly in the WBCFG drug market allowed it to set its prices unfettered by competition; (2) that Plaintiff and the class were required to purchase WBCGF drugs because they are absolutely necessary to treat cancer patients; (3) the amount that Medicare and other payors reimbursed Plaintiff and the class for Amgen's WBCGF drugs; and (4) that because of its WBCGF drug monopoly, Amgen did not need to provide any rebates purely for those drugs.

Amgen then used its knowledge to set the price and rebates for its monopoly WBCGF drugs at levels that forced Plaintiff and the class to purchase Aranesp (rather than its competitor), or face paying higher prices for those drugs then Medicare, and other insurers, would reimburse them at.  Thus, Plaintiff and the class were confronted with the unfortunate reality that if they did not purchase Aranesp, they would lose money on their essential purchases of Amgen's WBCGF drugs, due to Amgen manipulating its price and rebate levels as to take advantage of the prevailing reimbursement levels. Consequently, Plaintiff and class members were forced to, and did, pay more for Aranesp and/or the

bundle of Aranesp and Amgen's monopoly drugs, Neulasta and Neupogen, than they otherwise would have, but for this illegal tying scheme.

Plaintiff has standing to bring this antitrust action against Amgen as a direct purchaser of Amgen's RBCGF and WBCGF drugs pursuant to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). The allegations in the Complaint, as well as Amgen's admissions in its own documents and filings in its related action against Ortho Biotech Products, L.P. ("Ortho"), establish that 1) Plaintiff negotiated the rebates and ultimate purchase price for these drugs directly with Amgen, 2) Plaintiff engaged in consistent direct interactions with Amgen, and 3) Amgen paid rebates for Neulasta and Neupogen directly to Plaintiff. These facts, among others, demonstrate that Plaintiff purchased the drugs at issue directly from Amgen.

Furthermore, just as Amgen has no basis to support its Motion to Dismiss Plaintiff's Complaint, neither does it have any basis to have certain allegations in the complaint stricken, as shown within.

In short, there is no dispute about what Amgen did, or even why it did it. Amgen had a monopoly in the WBCGF drug market, but was not content to have the benefits of that monopoly limited to that market. Instead, it improperly leveraged its monopoly into the competitive RBCGF drug market through its illegal tying scheme, to gain market share and make more money on its RBCGF drug, which is precisely why tying is illegal under prevailing Supreme Court and Third Circuit law. Not only did Amgen create this illegal scheme but it also revised and extended it by modifying its price and rebate structure and measuring it against prevailing reimbursement schedules. In that way, Amgen was able to determine at what level prices and rebates had to be to "coerce"

Plaintiff and class members into buying enough Aranesp, so they could avoid losing money on their essential purchases of Amgen's WBCGF drugs for their cancer patients. *See* "Tying, Bundled Discounts, and The Death of the Single Monopoly Profit," 123 Harv. L. Rev. 397, 449 (Dec. 2009) ("[R]ational firms would not bother having a tying agreement unless they expected it to alter buyer choices.")

While Amgen structured its RBCGF and WBCGF sales to Plaintiff and class members by involving a wholesaler and a Group Purchasing Organization ("GPO"), it kept total control of those sales through contracts, direct negotiations and other contacts with Plaintiff and class members. In this way, despite Amgen's efforts to insulate itself from antitrust liability, Plaintiff and class members are direct purchasers and have standing to bring this case. Indeed, Plaintiff and class members were the only purchasers that Amgen directed its illegal scheme at and the only purchasers who were harmed by Amgen's illegal tie.

## II.    STATEMENT OF FACTS

Amgen manufactures Aranesp, an RBCGF drug that directly competes with Procrit, also an RBCGF drug, manufactured by Ortho. *See* Complaint, ¶ 2, filed September 25, 2009, attached hereto as Exhibit A. Aranesp and Procrit, as the only two drugs administered to cancer patients to treat anemia as a result of chemotherapy, are direct competitors. *See* Ex. A, ¶ 20. They work to stimulate red blood cell production that is depleted as a result of the chemotherapy treatment. *See* Ex. A ¶ 15.

Amgen also manufacturers Neulasta and Neupogen, WBCGF drugs, which are used to treat neutropenia, a potentially life-threatening white blood cell deficiency, also the result of chemotherapy. *See* Ex. A, ¶ 21. Thus, the RBCGF and WBCGF drugs are

distinct and separate products that are utilized for different purposes in treating cancer patients. *See* Ex. A, ¶¶ 1, 8, 63, 66, 80, 89. Amgen maintains a monopoly in the WBCGF drug market, with a 98% market share. *See* Ex. A, ¶¶ 1, 3, 17, 24, 25, 40, 45, 50, 52, 54, 60, 81, 90. Because Amgen controlled the rebates and price of its WBCGF drugs, it could ensure that the amount of reimbursement that purchasers, such as hospitals and clinics, received from Medicare and other health care payors, would be less than the actual cost of the drugs, therefore causing hospitals and clinics to lose money each time they purchased WBCGF drugs for their cancer patients. *See* Ex. A, ¶¶ 6, 25, 26, 28, 32, 33. There was no economic reason for Amgen to force providers of cancer treatments to lose money, absent its intent to use its monopoly power to force those providers to purchase Aranesp, rather than Procrit.

Plaintiff and the putative class are hospitals, doctors and clinics that purchased and administered both RBCGF and WBCGF drugs to their cancer patients. *See* Ex. A, ¶ 25. Just prior to the class period, Procrit, Ortho's RBCGF drug, had a 70% market share, at least in part because it was less expensive than Aranesp. *See* Ex. A, ¶¶ 1, 40. As for the WBCGF drugs, at all relevant times, Plaintiff and the putative class had very little choice but to purchase their WBCGF drugs from Amgen as a result of Amgen's monopoly. *See* Ex. A, ¶¶ 24, 25.

In order to improve its market share for Aranesp in the RBCGF market, Amgen concocted a scheme that took advantage of its monopoly in the WBCGF market. *See* Ex. A, ¶¶ 4, 6, 7, 26, 27, 35, 40, 45, 47, 60, 89, 94. Specifically, Amgen knew that 1) Plaintiff and class members had to purchase both RBCGF and WBCGF drugs in order to treat their cancer patients, 2) that Plaintiff and class members had to purchase their

WBCGF supply from Amgen due to its monopoly in the WBCGF market, and 3) it could use its monopoly power in the WBCGF drug market to set rebates and prices so that Plaintiff and class members would lose money on each purchase of WBCGF drugs. *See* Ex. A, ¶¶ 6, 24. With this power and knowledge, Amgen created a scheme that only allowed Plaintiff and class members with enough rebates on purchases of WBCGF drugs so that they would not suffer a loss each time they purchased them, but only on the condition that Plaintiff and class members also purchased Aranesp, rather than Procrit. *See* Ex. A, ¶¶ 1, 4, 6, 9, 26, 27, 29, 35, 37, 39, 40, 42, 45, 47, 49, 53, 54, 55, 60, 79, 83, 92. Amgen's illegal tying scheme worked so well, that, for example, Aranesp sales in the United Stated surged by 56% in 2004. *See* Ex. A, ¶ 41. Consequently, Amgen continued to use its monopoly power in the WBCGF drug market to economically coerce Plaintiff and class members into buying more and more Aranesp instead of Procrit. *See* Ex. A, ¶ 1, 4, 6, 7, 9, 26, 27, 28, 35, 40, 60, 89, 94. Amgen's tying scheme resulted in damages to Plaintiff and the class in the form of the increased prices they had to pay for 1) Aranesp over Procrit, and/or 2) the bundle of Aranesp and the WBCGF drugs they purchased over the bundle of RBCGF and WBCGF drugs they would have purchased absent the illegal tying scheme. *See* Ex. A, ¶ 4.

Because Plaintiff and class members each had contracts with Amgen that set forth the material terms of their purchases of Amgen's drugs, *i.e.*, rebates, purchase requirements and net price, they directly purchased the bundled combination of RBCGF and WBCGF drugs from Amgen and have standing to sue Amgen as direct purchasers. *See* Ex. A, ¶ 13. Amgen, nevertheless, argues in its brief that Plaintiff and the class members are indirect purchasers of RBCGF and WBCGF drugs because it claims

Plaintiff and class members purchased those drugs through a "wholesaler," AmerisourceBergen.  *See* Amgen Brief in Support of its Motion to Dismiss, filed December 9, 2009 ("Def. Br.") at 11-12.  However, the facts and allegations in the Complaint demonstrate that Plaintiff and class members are direct purchasers of RBCGF and WBCGF drugs from Amgen,[1] *e.g.*, 1) Plaintiff and class members directly negotiated the amount of rebates they would receive from Amgen for the WBCGF drugs, which determined the ultimate price Plaintiff would pay for these drugs and 2) Amgen paid rebates for the WBCGF drugs directly to Plaintiff and class members.  *See* Ex. A, ¶ 13; Declaration of Murray Marsh, Chief Financial Officer of Plaintiff Warren General Hospital, ¶ 2, attached hereto as Exhibit B.  Thus, Amgen retained control of its sale of RBCGF and WBCGF drugs to Plaintiff and class members.  In addition, Amgen's rebates, and the Medicare and other payor reimbursement schedules Amgen was aware of, only applied to Plaintiff and the class members, not wholesalers or GPOs.

As a result of Amgen's illegal tying scheme, Ortho sued Amgen in 2005.  In July 2008, Amgen resolved Ortho's antitrust claim by agreeing to pay Ortho $200 million. *See* Ex. A, ¶ 61.  In its Answer to Ortho's Complaint, Amgen continuously referenced Plaintiff and class members as if they were direct purchasers of RBCGF and WBCGF drugs.[2]  For example, "Amgen admits that many clinics engaged in the treatment of

---

[1] Plaintiff agrees with Amgen that this court "may consider documents relied upon by plaintiff in the complaint or central to plaintiff's complaint."  Def. Br. at 4 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).  As such, Plaintiff has attached documents it relied on to allege that it is a direct purchaser of RBCGF and WBCGF drugs.

[2] A court may take judicial notice of admissions in pleadings filed by a party in other judicial pleadings. *See In re Intelligroup Securities Litig.*, 527 F. Supp.2d 262, 273 (D.N.J. 2007) ("[T]he court may take judicial notice of public records and of 'admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action' without converting the motion into one for summary judgment.")(Internal quotations omitted).

cancer patients buy WBCGF drugs from Amgen." *See* Amgen's Answer to Ortho's Complaint, attached hereto as Exhibit C, ¶¶ 23, 26, 28, 30, 49, 77, 86.

Additionally, in documents Amgen provided to Plaintiff and class members, Amgen consistently referred to Plaintiff and class members as purchasers of RBCGF and WBCGF drugs, which were directly purchased from Amgen. *See* Enhanced Momentum II Contract, dated March 31, 2005, attached hereto as Exhibit D; 2008 Amgen Achievement Agreement Contract, attached hereto as Exhibit E; Amgen's 2004 Physician Clinic Agreement, attached hereto as Exhibit F; Amgen's 2008 Physician Clinic Agreement, attached hereto as Exhibit G; February 20, 2007 Letter from Amgen to Centers for Medicare and Medicaid Services, attached hereto as Exhibit H; and January 2007 Letter from Amgen to class members ("Dear Valued Customer"), attached hereto as Exhibit I.

Thus, both the facts alleged and Amgen's own admissions establish that Plaintiff and the class are direct purchasers who have suffered a direct harm caused by Amgen's illegal tying scheme.

### III.    STANDARD OF REVIEW

According to *Caldwell Trucking PRP Group v. Spaulding Composites, Co., Inc.*, 890 F. Supp. 1247, 1251 (D. N.J. 1995), "Federal Rule of Civil Procedure 12(b)(6) allows a party to move for a dismissal based upon the pleader's 'failure to state a claim upon which relief can be granted.'"  However, "[s]ince the long-established federal policy of civil litigation is to decide cases on the proofs, district courts generally disfavor Rule 12(b)(6) motions."  *See id.* (citing *Melo-Sonics Corp. v. Cropp,* 342 F.2d 856 (3d Cir. 1965); *Panek v. Bogucz,* 718 F. Supp. 1228, 1229 (D. N.J. 1989)).

Consequently, "[a] Motion to Dismiss is viewed with disfavor and should only be granted when it is clear that the pleadings do not establish a cause of action." *Lojeski v. Boandi*, 602 F. Supp. 918, 920 (E.D. Pa. 1984).  The accepted rule is "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Quinones v. U.S.,* 492 F.2d 1269, 1273 (3d Cir. 1974).

**IV.**   **LEGAL ARGUMENT**

   **A.  Plaintiff Has Clearly and Properly Pled a *Per Se* Illegal Tying Claim Against Amgen.**

Amgen essentially relies on only one Section 2 monopoly case, *SmithKline v. Eli Lilly*, 575 F.2d 1056 (3d Cir. 1978), which is over thirty years old, for the proposition that Plaintiff's *Section 1 tying* case must fail because it does not allege that "the defendant conditioned the sale of one product on the sale of another product."  Def. Br. at 6. However, a close reading of the numerous Supreme Court and Third Circuit tying cases since 1978, none of which were cited by Amgen, demonstrates that what Plaintiff did allege in detail, *i.e.*, that Amgen, manufacturer and seller of two separate and distinct products, improperly used and leveraged its monopoly power (98% market share) in the tying product market (WBCGF drugs) to force class members to buy its tied product (RBCGF drugs) in the competitive RBCGF drug market, thereby restraining and impairing competition in the tied product (RBCGF drug) market (Ex. A, ¶¶ 1, 4, 6, 53), is consistent with Third Circuit and Supreme Court precedent and is more than enough to sustain Plaintiff's *per se* Section 1 tying claim.

"The essential characteristic of a tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product

that the buyer either did not want at all, *or might have preferred to purchase elsewhere on different terms*." *Gordon v. Lewistown Hosp.*, 423 F. 3d 184, 214 (3d Cir. 2005) (emphasis added) (*citing Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)).  In other words, "the antitrust concern over tying arrangements is limited to those situations in which the seller can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not, thereby restraining competition in the tied product market." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442-43 (3d Cir. 1997) (*quoting Allen-Myland, Inc. v. IBM*, 33 F.3d 194, 200 (3d Cir. 1994)).  "Even if a seller has obtained a monopoly in the tying product legitimately (as by obtaining a patent), courts have seen the expansion of that power to other product markets as illegitimate and competition suppressing." *Queen City Pizza*, 124 F.3d at 442-43 (*quoting Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 475 (3d Cir. 1992)).  *See* "Tying," 123 Harv. L. Rev. at 420 ("[T]he quasi-per se rule makes it illegal to tie together separate products when the defendant (1) has tying market power and (2) forecloses a nontrivial dollar amount of sales in the tied market.")

Of the tying cases that have failed, most have done so because the defendant did not have sufficient market power in the tying product market.  *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 512-13 (3d Cir. 1998); *Queen City Pizza*, 124 F.3d at 442-43; *Allen-Myland*, 33 F.3d at 200-01; *Town Sound*, 959 F.2d at 475; *Med Alert Ambulance, Inc. v. Atlantic Health System, Inc.*, Civ. A. No. 04-1615 (JAG), 2007 WL 2297335, at *6 (D. N.J. Aug. 6, 2007).  Thus, "[t]he first inquiry in any § 1 tying case is whether the defendant has sufficient market power over the tying product, which

requires a finding that two separate product markets exist and a determination of precisely what the tying and tied product markets are." *Queen City*, 124 F.3d at 443 (*quoting Allen-Myland*, 33 F.3d at 200-201). *See also Jefferson Parish*, 466 U.S. at 21. If the defendant is found to have sufficient market power in the tying product market, then the tie may be a *per se* violation of the Sherman Act.  "The Supreme Court has noted that courts typically find sufficient economic power in the tying market to condemn tying arrangements per se when the defendant's share of the market is so high that it occupies a dominant market position."  *Town Sound*, 959 F.2d at 479 (*citing Jefferson Parish*, 466 U.S. at 16-17); *Med Alert*, 2007 WL 2297335 at *7.  *See also U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 621-22 (1977) (recognizing that the key question in establishing sufficient market power is whether the seller has some cost advantage not shared by its competitors which makes its competitors unable to provide the tying product).

Assuming sufficient power in the tying market is found, then under the *per se* analysis, a plaintiff must prove that (1) the defendant sells two distinct products, (2) the seller possesses market share (power) in the tying product market, and (3) a substantial amount of interstate commerce is affected.  *See Gordon*, 423 F.3d at 214; *Brokerage Concepts*, 140 F.3d at 512-13; *Allen-Myland*, 33 F.3d at 200-01; *Town Sound*, 959 F.2d at 475; *Med Alert*, 2007 WL 2297335, at *6.  Regarding the third element, whether "a substantial amount of interstate commerce" has been affected by the tie, the Supreme Court has defined "substantial" in absolute dollar terms as an amount which is not *de minimis* in terms of the "total volume of sales tied by the sales policy under challenge ..." *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ($190,000

sufficient).  Where the above three elements are shown, the *per se* test is met and the

defendant's tying practices are condemned without further proof of anti-competitive

effect.  *See Jefferson Parish*, 466 U.S. at 15-18 & n. 25; *Brokerage Concepts*, 140 F.3d at

513; *Town Sound*, 959 F.2d at 477.

Applying the "established Third Circuit law" (Def. Br. at 10) cited above - none

of which was cited by Amgen - to the allegations in Plaintiff's complaint is relatively

straightforward.  Plaintiff has alleged, and Amgen does not dispute, that "two separate

product markets exist," namely the tying product market (WBCGF drugs) and the tied

product market (RBCGF drugs).  *See* Ex. C, ¶ 86 ("Amgen admits that sales of WBCGF

drugs are separate and distinct from sales of RBCGF drugs, which are sold to different

types of customers such as oncology clinics, hospitals, etc."); Ex. A, ¶¶ 1, 8, 63, 66, 80,

89.  *See also Jefferson Parish*, 466 U.S. at 21; *Queen City*, 124 F.3d at 443 (*quoting*

*Allen-Myland*, 33 F.3d at 200-201).  Plaintiff has further alleged that Amgen not only had

a patent on the tying product, but also had a 98% market share in the tying product

market (WBCGF drugs).  Amgen does not contest – nor could it - that such a market

share is more than high enough to occupy a "dominant market position."  *See* Ex. A, ¶¶ 1,

3, 17, 24, 25, 40, 45, 50, 52, 54, 60, 81, 90.  *See also Town Sound*, 959 F.2d at 479 (*citing*

*Jefferson Parish*, 466 U.S. at 16-17); *Med Alert*, 2007 WL 2297335, at *7.  Therefore,

Plaintiff's allegations identify a tying scheme that should be analyzed under the *per se*

test.

Following the legal framework set out above for *per se* tying cases, Plaintiff has

clearly alleged, among many other facts, that (1) the defendant sells two distinct products

(WBCGF and RBCGF drugs) (Ex. A, ¶¶ 1, 8, 63, 66, 80, 89), (2) the seller possesses

market power in the tying product market (98%) (Ex. A, ¶¶ 1, 3, 17, 24, 25, 40, 45, 50, 52, 54, 60, 81, 90), and (3) several billion dollars, certainly a "substantial amount of commerce," has been affected.  *See* Ex. C, ¶ 23;[3] Ex. A, ¶¶ 2, 8, 20, 64, 82, 91.  *See also Fortner*, 394 U.S. at 501-02.  Therefore, under applicable Third Circuit law, Plaintiff has clearly and adequately alleged a *per se* tying violation of Section 1 of the Sherman Act. *See Gordon*, 423 F.3d at 214; *Brokerage Concepts*, 140 F.3d at 512-13; *Allen-Myland*, 33 F.3d at 200-01; *Town Sound*, 959 F.2d at 475; *Med Alert*, 2007 WL 2297335, at *6.

While Amgen's "conditioned sale" requirement is not an overt element in the *per se* analysis set out above, there is an implied requirement of "coercion" in a tying claim, which was clarified by the Supreme Court in *Jefferson Parish*, 466 U.S. at 12.  Plaintiff has addressed that implied requirement by alleging throughout the complaint that Amgen used its monopoly power in the WBCGF drug market to "force" or "coerce" Plaintiff and class members into buying Amgen's Aranesp at the expense of the competing Procrit, or they would lose money every time they provided WBCGF drugs to cancer patients who needed it to save their lives.  *See* Ex. A, ¶¶ 1, 4, 6, 9, 26, 27, 29, 35, 37, 39, 40, 42, 45, 47, 49, 53, 54, 55, 60, 79, 83, 92.  And, indeed, Amgen's tying scheme is the very type that recent Supreme Court cases have been concerned with.  *See Town Sound*, 959 F.2d at 476 ("[M]ore recent Supreme Court cases have primarily concerned themselves with that danger when a seller leverages economic power from one market to another.")

To more fully understand the implied coercion or "forcing" requirement of a tying claim, a close reading of *Jefferson Parish* is helpful:

> Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to

---

[3]  "Amgen admits that gross sales of RBCGF drugs to United States Oncology clinics for Procrit and Aranesp are projected to exceed $2.8 billion in 2005."

> force the buyer into the purchase of a tied product that the buyer either did not
> want at all, or might have preferred to purchase elsewhere on different terms.
> When such "forcing" is present, competition on the merits for the tied item is
> restrained and the Sherman Act is violated.

*Jefferson Parish*, 466 U.S. at 12 (emphasis added).  Thus, the Supreme Court equated

"forcing" with a Plaintiff who "might have preferred" to purchase [the tied product]

elsewhere on different terms, *i.e.*, a hospital or oncology clinic that was forced to make

large purchases of the more expensive Aranesp to avoid losing money on every one of its

essential purchases of Amgen's WBCGF drugs.  *See* Ex. A, ¶¶ 1, 4, 5, 6, 53.

"In sum, the Supreme Court's primary concern with tying arrangements has

always been the use of tie-ins to abuse power in the tying product market," which exactly

describes Plaintiff's allegations regarding Amgen's abuse of its monopoly power in the

WBCGF drug market, *i.e.*, Amgen's overarching continuing scheme to leverage its

monopoly power in the WBCGF market to coerce Plaintiff and all class members into

purchasing Aranesp rather than Procrit.  *See* Ex. A, ¶¶ 1, 4, 6, 9, 26, 27, 28.  *See also*

*Town Sound*, 959 F.2d at 476.

Amgen knew how Medicare and private plans reimbursed for its drugs.  It used

this knowledge to set up a rebate system for its WBCGF drugs that forced each class

member to lose money for every administration of WBCGF unless they purchased

Aranesp, rather than its cheaper competitor.  *See* Ex. A, ¶¶ 25, 26, 28, 32, 33.  Since

Amgen had a dominant position in the WBCGF drug market, it had no need to offer any

incentives purely in that market.  Therefore, Amgen's only reason for offering rebates on

its monopoly WBCGF drugs was to coerce class members into buying Aranesp.  Amgen

provided enough discounts to avoid losing money on its WBCGF drugs only to those

class members that purchased Aranesp, its RBCGF drug.  Without these discounts, these

class members could only purchase WBCGF drugs from Amgen at a price *above* Medicare's reimbursement rate.  Consequently, Plaintiff and the class were coerced into purchasing Aranesp, so they could purchase Amgen's WBCGF drugs at a cost that would not put them out of business.  Were there alternatives to Amgen's two WBCGF products, or if WBCGF drugs were not essential for treatment of their patients, this case might not be particularly noteworthy.  But Amgen's tying scheme exploited both its WBCGF drug monopoly and class members' cancer patients' dependence on these drugs to extend its WBCGF monopoly power into the otherwise competitive RBCGF drug market.

Indeed, MedPAC, the body which advises Congress on Medicare issues, was directed by Congress to conduct two studies on Medicare Part B payment changes.  The studies were to focus on quality of care and physician practices, among other things.  On October 6, 2006, MedPAC presented its report, which included a very critical finding on a practice called "bundling," which one Commissioner termed "predatory" and designed to force physicians to make choices that are not clinically based.  *See Modifying Medicare Part B Reimbursement Rules to Put Patients First*, Center for Health Transformation, By Newt Gingrich and Robert Egge (Oct. 2006), attached hereto as Exhibit J (citing 10/6/06 MedPAC Report).

Accordingly, the Supreme Court has:

condemned tying arrangements when the seller has some special ability-usually called "market power"-to force a purchaser to do something that he would not do in a competitive market....When the seller's power is just used to maximize its return in the tying product market, where presumably the product enjoys some justifiable advantage over its competitors, the competitive ideal of the Sherman Act is not necessarily compromised.  But if that power is used to impair competition on the merits in another market, a potentially inferior product may be insulated from competitive pressures.

*Jefferson Parish*, 466 U.S. at 13-14 (citations omitted).  Here, of course, Plaintiff has alleged that Amgen has not used its monopoly power in the WBCGF drug market just to "maximize its return in the tying product market," but has "used [it] to impair competition on the merits in another market," namely the competitive, tied product, RBCGF drug market.  *See* Ex. A, ¶¶ 4, 6, 7, 26, 27, 35, 40, 45, 47, 60, 89, 94.

Cases from other Circuits can also help illuminate the implied coercion or "forcing" requirement.  Indeed, the Ninth Circuit, which Amgen has urged this Court to follow on the *Illinois Brick* issue addressed below, has several particularly instructive decisions.  For example, in *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159-60 (9th Cir. 2003), after setting out the three elements a plaintiff must prove to prevail on an illegal tying claim, "(1) that there exist two distinct products or services in different markets whose sales are tied together; (2) that the seller possesses appreciable economic power in the tying product market sufficient to coerce acceptance of the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market," the court stated that to meet the essential second element of a tying claim, the plaintiff "must present evidence that the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product." *Id.* at 1159.  It then offered examples of where defendants had crossed "the dividing line between acceptable persuasion and illegal coercion . . ." *Id.* These include: 1) when the plaintiff demonstrated that the defendant had leveraged its "substantial economic power" in the tying market to force buyers to accept the tie-in, *N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 7 (1958), 2) when a plaintiff introduced evidence that defendant possessed market power over a product, which it used to force customers to

buy an undesirable product, *U.S. v. Loew's Inc.*, 371 U.S. 38, 45-47 (1962), and 3) when a plaintiff produced a written contract that required the purchase of the tied product on extremely onerous terms, *Moore v. Thomas A. Mathews Co.*, 550 F.2d 1207, 1216-17 (9th Cir. 1977). *See Paladin*, 328 F.3d at 1160. The allegations in this case, that Amgen used its monopoly power in the WBCGF drug market to force purchasers to buy Aranesp by creating onerous conditions under which they would lose money on their essential purchases of the WBCGF drugs if they did not, also clearly cross the line into "illegal coercion" territory.

In a more recent Ninth Circuit case, *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 914-16 (9th Cir. 2008), the court, in deciding a summary judgment motion, cited to evidence that showed that, while plaintiff was not explicitly forced to deal exclusively with PeaceHealth, PeaceHealth's higher prices would have had a "large impact" on plaintiff, and that plaintiff had been "held hostage" by PeaceHealth's pricing practices. Based on that, and "additional evidence of economic coercion," *id.* at 915, the court held that:

> when all justifiable factual inferences are drawn in McKenzie's favor, there is no doubt that PeaceHealth's practice of giving a larger discount to insurers who dealt with it as an exclusive preferred provider may have coerced some insurers to purchase primary and secondary services from PeaceHealth rather than from McKenzie. We conclude that, as a whole, the evidence shows genuine factual disputes about whether PeaceHealth forced insurers either as an implied condition of dealing *or as a matter of economic imperative through its bundled discounting*, to take its primary and secondary services if the insurers wanted tertiary services.

*Id.* at 914 (emphasis added).

Further, while acknowledging that "the Supreme Court has condemned tying arrangements when the seller has the market power to force a purchaser to do something that he would not do in a competitive market," *id.* at 915-16 (*citing Jefferson Parish*, 466

U.S. at 17), the court noted that "the substantial market power PeaceHealth possessed . . . creates a possibility that PeaceHealth was able to force unwanted purchases of primary and secondary services."  Therefore, the court held that "whether PeaceHealth in fact used its market power to effectively coerce purchases of primary and secondary services is a question that can be answered only through further factual development," and added that "a trier of fact might reasonably determine McKenzie established a claim of illegal tying based on the evidence in the record."  *Id.*

> Finally, the court remarked that the plaintiff, on remand, could:
>
> stake[] its tying claim not on a theory that PeaceHealth explicitly (e.g., by contract) or implicitly coerced insurers to purchase primary and secondary services from PeaceHealth as a condition to obtaining tertiary services, but on a theory that PeaceHealth's bundled discounts *effectively left insurers with no rational economic choice other than purchasing tertiary services from PeaceHealth* . . .

*Cascade*, 515 F.3d at 916 n. 27 (emphasis added).  *See also Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1576 (11th Cir. 1991)("In order to prove the economic coercion prong of the tying analysis, the plaintiffs must prove both that Metro has 'sufficient market power' within the tying market and that Metro has wielded its market power to force brokers to 'buy a product that [they do] not want or would have preferred to buy elsewhere on other terms.'") (*citing Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1416, 1420 (11th Cir. 1987)).  As discussed throughout this brief, Amgen did use its monopoly power in the WBCGF drug market to coerce Plaintiff and the class members into purchasing Aranesp.

On the other side of the ledger, Amgen has relied almost exclusively on *SmithKline*, 575 F.2d at 1057-58, in which "[t]he major question for decision is whether the district court in a non-jury trial erred in defining the relevant product market in a

proceeding brought by SmithKline Corporation against Eli Lilly and Company under § 2

of the Sherman Act, which proscribes monopolies and attempts to monopolize."  That

*SmithKline* is a § 2 monopoly case, unlike the § 1 tying cases cited above, explains why

the bulk of Amgen's cites are confined to footnote 3 of that opinion, which starts by

stating:

> The district court found, *and it is not disputed*, that Lilly did not condition the
> availability of any of its products on the purchase of any other of its products or
> on the refusal of purchasing hospitals to deal with its competitors. . . .*We accept
> the decision of the district court* that, in the absence of such a requirement, there
> is no illegal tie-in.

*SmithKline*, 575 F.2d at 1062 n. 3 (Emphasis Added).  Thus, this footnote is dicta because

the court was not deciding the tying issue, but was merely "accepting" the district court's

uncontested ruling.  What the court did decide, in the body of the opinion, was the

monopoly issue, which has no bearing on this case:

> In sum, the act of willful acquisition and maintenance of monopoly power was
> brought about by linking products on which Lilly faced no competition Keflin and
> Keflex with a competitive product, Kefzol. . . . The Revised CSP blatantly revised
> those economic laws and made Lilly a transgressor under § 2 of the Sherman Act.

*Id.* at 1065.[4]

A close review of Plaintiff's allegations, *e.g.*, Ex. A, ¶ 53, demonstrates why

Amgen did not cite the abundant Supreme Court and Third Circuit § 1 tying cases cited

above, and instead relied on dicta from an older § 2 monopoly case.  Under the applicable

law, Plaintiff's allegations clearly meet the requirements for a *per se* § 1 tying case: (1)

---

[4]  Defendant's reliance on *Innovation Data Processing, Inc. v. IBM*, 585 F. Supp. 1470 (D. N.J. 1984) is
misplaced, as it was decided three days after *Jefferson Parish*, and did not cite to that seminal decision, 466
U.S. at 11 ("The essential characteristic of a tying arrangement lies in the seller's exploitation of its control
over the tying product to force the buyer into the purchase of a tied product that the buyer either did not
want at all, *or might have preferred to purchase elsewhere on different terms*.").  Similarly, in *Broadcom
Corp. v. Qualcomm, Inc.*, 2006 WL 2528545 *13 (D. N.J. Aug. 31, 2006), there were no allegations
concerning economic coercion, and the court was not asked to determine whether such allegations met the
requirements for an illegal tying case.  *See* Def. Br., at 8-9.

the defendant sells two distinct products, (2) the seller possesses market power in the

tying product market, and (3) a substantial amount of interstate commerce is affected.

*See Gordon*, 423 F.3d at 214; *Brokerage Concepts*, 140 F.3d at 512-13; *Allen-Myland*, 33

F.3d at 200-01; *Town Sound*, 959 F.2d at 475; *Med Alert*, 2007 WL 2297335 at *6.  In

addition, Plaintiff also clearly alleged more than enough to satisfy the Supreme Court's

implied coercion or "forcing" element.  *See Jefferson Parish*, 466 U.S. at 12-14; *Cascade*,

515 F.3d at 915-16; *Paladin*, 328 F.3d at 1159-60.  *See also* Ex. A, ¶¶ 1, 4, 6, 9, 26, 27,

29, 35, 37, 39, 40, 42, 45, 47, 49, 53, 54, 55, 60, 79, 83, 92.

### B.  Plaintiff and the Proposed Class Have Standing to Sue Amgen Because They Are Direct Purchasers of RBCGF and WBCGF Drugs Under *Illinois Brick*.

Plaintiff is a *direct purchaser* of RBCGF and WBCGF drugs from Amgen.  The

allegations in the complaint and the facts underlying the relationship between Plaintiff

and Amgen are consistent with the definition of a direct purchaser and the corresponding

policy considerations outlined in *Illinois Brick*, 431 U.S. at 720.

The rationale of *Illinois Brick*, *i.e.*, in the context of an antitrust violation resulting

in the inflated price of a good, an indirect purchaser of that good could not show it was

injured because the overcharge was passed onto it by a direct purchaser, is not applicable

to the facts at issue.  *See id.* at 720.  Amgen's illegal tying scheme is predicated on

rebates and reimbursement payments only to class members and not to wholesalers or

GPOs.   This is not a situation where a wholesaler paid an inflated price, which it then

passed on to plaintiff and the class.  Rather, the wholesaler was not impacted by the tying

scheme in any way, because the coercive Aranesp purchasing requirements, and the

Medicare reimbursement methodology, pertain only to class members.  Only Plaintiff and

class members were forced to purchase Aranesp to avoid losing money on their essential purchases of Amgen's monopoly WBCGF drugs, and thus, only Plaintiff and class members were harmed by the tying scheme.  Therefore, Plaintiff and the class members are the only direct purchasers and victims under *Illinois Brick*.

The Supreme Court in *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990), outlined three rationales for the "indirect purchaser rule" set out in *Hanover Shoe* and *Illinois Brick*:

> (1) establishing the amount of an overcharge shifted to indirect purchasers would normally prove insurmountable in light of the wide range of considerations influencing a company's pricing decisions;
> (2) a pass-on defense would reduce the effectiveness of § 4 [Clayton Act] actions by diminishing the recovery available to any potential plaintiff; and
> (3) allowing suits by indirect purchasers would risk multiple liability because the alleged antitrust violators could not use a pass-on defense in an action by direct purchasers.

*Id.* at 199-200, 207.  The facts of this case, even at the pleading stage, establish that Amgen's illegal tying scheme: (1) caused an overcharge only to Plaintiff and the class; (2) did not impact wholesalers, so there is no pass-on defense issue; and (3) only caused damage to Plaintiff and the class, so there is no risk of multiple liability.  All three of the Supreme Court's rationales are consistent with Plaintiff's status as a direct purchaser, which will serve to promote "the vigorous enforcement of antitrust laws" under § 4 of the Clayton Act.  *Id.* at 214.  Wholesalers are completely unaffected by Amgen's illegal tying scheme, and thus, there is no chance that Amgen could face an additional lawsuit brought by AmerisourceBergen or any other wholesaler.

This very Court recently applied *Illinois Brick* under similar circumstances in *In re Mercedes-Benz Anti-Trust Litig.*, 364 F. Supp.2d 468 (D. N.J. 2005).  In that case,

plaintiffs sued manufacturer Mercedes-Benz USA (MBUSA) and its tri-state area dealers (collectively "defendants") for conspiring to fix the prices of automobiles they sold and leased to the plaintiffs through defendant dealers throughout the tri-state area. *See id.* at 469-470. The lessee plaintiff had initially negotiated the monthly lease payments with the dealer, not the leasing company, as dealers had a "powerful incentive to reach an agreement with the customer," and were "very conscious that their profitability opportunities are expanded the more vehicles they are able to sell to customers or to leasing companies for lease to customers." *Id.* at 472. After the dealer and the lessee plaintiff negotiated the monthly lease payments, the lease was accepted by the leasing company, who in turn purchased the vehicle for use by the plaintiff. Thus, the leasing company paid the dealer the purchase price, and thus bought the vehicle the lessee plaintiff sought to lease. *Id.* at 471. Title to the vehicle showed the leasing company as the owner. *Id.* at 473. However, the leasing company did not deal directly with the lessee plaintiff on the lease transaction, and was not involved in the negotiations between the dealer and the lessee plaintiff. *Id.* at 473-74.

MBUSA argued that the lessee plaintiffs did not have standing under *Illinois Brick*, because they were indirect purchasers in that the leasing company purchased the vehicles from the dealers, and the overcharge was borne by the leasing company. *Id.* 477-78. The Court disagreed:

> The mechanics of how a leasing transaction is initiated and executed provides support for plaintiffs' position because the lessees had *direct interaction* with defendants. *This is unlike the paradigm in which there is usually no direct interaction between the antitrust violator and the indirect purchaser.*

*Id.* at 480 (emphasis added).  Furthermore, the court interpreted *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir. 1993), "*to require that district courts look beyond a limited definition of direct purchaser to other facts that are suggestive of purchaser status.*"  *Id.* at 481 (emphasis added).  In *Gulfstream*, plaintiff sued the defendant manufacturer of a business jet aircraft "alleging a horizontal price-fixing conspiracy to fix prices on new jets."  *Id.* at 480 (*citing Gulfstream*, 995 F.2d at 428).  However, the plaintiff had assigned its purchase agreement with the defendant "before the plane was ready for delivery."  *Id.* (*citing Gulfstream*, 995 F.2d at 430).  Consequently, defendant argued that plaintiff lacked standing to assert the antitrust violation "because it has assigned the agreement and never 'purchased' the plane."  *Id.* at 481.  The Third Circuit stated that "even if this court accepted the view that standing should generally be limited to purchasers, defendant's argument seeks to exalt form over substance."  *Id.* (*quoting Gulfstream*, 995 F.2d at 430).  Thus, the court found that the plaintiff was entitled to assert antitrust claims against the defendant, even though it had assigned its right to purchase the aircraft.  *See id.* at 481.  The *Mercedes* Court found *Gulfstream* "enlightening for its guidance on how courts should approach the determination of who is a purchaser."  *Id.*

Just like the lessee plaintiffs in *Mercedes*, Plaintiff here negotiated the ultimate price of the product it purchased directly with the manufacturer.  Just as the leasing company did not prevent the *Mercedes* plaintiffs from being deemed direct purchasers, so too the wholesaler here should not prevent Plaintiff from being deemed a direct purchaser, as both the leasing company in *Mercedes* and AmerisourceBergen here had very little involvement with plaintiffs' interactions with the respective manufacturers.

Furthermore, in determining whether the *Mercedes* plaintiffs were direct purchasers,

Judge Walls looked "*beyond a limited definition of direct purchaser to other facts that*

*are suggestive of purchaser status.*" *Id.* at 481 (*citing Gulfstream*, 995 F.2d at 425).

Consequently, just as Judge Walls did in *Mercedes*, this Court should look at these

overwhelming facts to find that Plaintiff and class members are direct purchasers of

RBCGF and WBCGF drugs from Amgen.

As such, *Illinois Brick* is not a bright line rule within this circuit, and a court must

look to the reality of the transaction in deciding whether a plaintiff is a direct purchaser.

Here, as demonstrated below, the reality of the transaction and "other facts that are

suggestive of purchaser status" clearly show that Plaintiff is a direct purchaser of the

RBCGF and WBCGF drugs from Amgen.[5]

### 1. Amgen and Plaintiff have a contractual relationship, and the existence of a GPO is inconsequential to Plaintiff's status as a Direct Purchaser.

First, Amgen claims that Plaintiff does not have a contractual relationship with

Amgen, which therefore weakens Plaintiff's status as a direct purchaser. *See* Def. Br. at

14. To the contrary, however, there is an Enhanced Momentum II Contract, dated March

31, 2005, between Amgen and Plaintiff, which was created by Amgen and negotiated

between Amgen and Plaintiff at Plaintiff's place of business. *See* Ex. D.[6]  In this

---

[5] *See also Doe v. Arizona Hospital and Assoc.*, 2009 WL 1423378, at *7-8 (Mar. 19, 2009, D. Ariz) **(Error! Main Document Only.**"'[D]irect interaction' between the customers and the alleged antitrust violators . . .is 'unlike the paradigm in which there is usually no direct interaction between the antitrust violator and the indirect purchaser.'") (*quoting Mercedes*, 364 F. Supp.2d at 480).  The *Doe* court did not apply the indirect purchaser rule because "the mechanics of the relationship between the nurses and the agencies, between the agencies and the hospitals, and between the nurses and the hospitals are not analogous to a wholesaler who sells to a retailer who sells to a consumer."

[6] *See also* Plaintiff's "2008 Amgen Achievement Agreement (AAA) Contract" with Amgen, which sets out Amgen's "Rebate Requirements" dependant on *Plaintiff's purchases* of Aranesp, Neulasta and Neupogen,

contract, Amgen set out the "Quarterly Rebate Opportunity" for Amgen drugs Aranesp,

Neupogen and Neulasta that corresponded to *Plaintiff's purchases* of Aranesp.  *See* Ex.

D, pp. 2-4.  The contract's rebate opportunities for the Plaintiff were *not* contingent upon

a wholesaler's or GPO's purchase of the drugs.  In fact, pursuant to Amgen's contract

with Plaintiff, Amgen provided to Plaintiff its market share performance for the drugs in

a monthly "Market Share Performance" report and "Multiproduct Statement Calculation"

pursuant to the Momentum II contract.  *See* Ex. D, p. 5.  Amgen's monthly reports to

Plaintiff did not track any wholesaler's or GPO's purchases of Aranesp, Neupogen or

Neulasta.  Amgen's reports only contained Plaintiff's market performance, and named

Warren General Hospital and its "net purchases" as the subject of the market

performance.  Furthermore, Amgen's reports consistently referred to "your agreement"

with Amgen, meaning Plaintiff's agreement with Amgen.  *See id.*  For example, Amgen's

reports stated:

- "This Business Review is intended to illustrate the discount and rebate structures under *your Amgen Agreement*;"

- "Please refer to *your Agreement* for all terms and conditions;" and

- "In addition, and importantly, *actual product purchases* and individual product usage *are the sole responsibility of the individual practitioner* based on actual patient need and appropriate clinical judgment."

*Id.*  (Emphasis added).  The record evidences that this contract was between Amgen and

Plaintiff for the purchase of Amgen's drugs, and thus, Amgen's argument that there was

no contract between Amgen and Plaintiff is wrong.

Second, Amgen suggests that because Plaintiff was a member of Premier

Purchasing Partners, L.P. ("Premier"), a GPO that had its own contract with Amgen, this

---

attached hereto as Exhibit E, and *see* 2007 Amgen Portfolio Rebate Program Letter Agreement, attached
hereto as Exhibit K, as an example of a contract that Amgen had with other class members.

weakens Plaintiff's status as a direct purchaser.  *See* Def. Br. at 14.  Again, Amgen is wrong.

GPOs are not purchasers.  They "are organizations that negotiate standardized contracts with manufacturers and suppliers of medical devices on behalf of their members."  *Natchitoches Parish Hosp. Service District v. Tyco Int. LTD*, 247 F.R.D. 253 (D. Mass. 2008).  Accordingly,

> GPOs *do not purchase* any products, *nor do they sign or otherwise enter into the contracts that they negotiate on behalf of their members.*  Instead, GPOs negotiate standard form, or model, contracts that the members themselves sign and enter into with manufacturers.

*Id.* at 256 (emphasis added).  In *Natchitoches*, plaintiffs were considered to be direct purchasers even though they had negotiated the price of defendant's products through a GPO.  *See id.* at 256.  As such, the presence of a GPO is inconsequential to Plaintiff's status as a direct purchaser, especially in light of the direct contractual relationship between Plaintiff and Amgen.

> **2.  The presence of AmerisourceBergen as a wholesaler is a legal fiction serving only as an attempt to insulate Amgen from antitrust liability.**

Amgen argues that because there is a wholesaler, Plaintiff is not a direct purchaser under *Illinois Brick*.  However, AmerisourceBergen *did not operate as a typical wholesaler with respect to Plaintiff and the class members' purchases of the RBCGF and WBCGF drugs from Amgen*.  For most drugs – excluding Aranesp, Nuelasta and Neupogen -- AmerisourceBergen negotiated with Plaintiff and class members for all purchasing terms.  However, Amgen required that Plaintiff negotiate the purchase requirements and rebates (and thus net price) for Aranesp, Neulasta, and Neupogen

exclusively with Amgen, and to communicate directly with Amgen to determine what the net costs for these drugs would be.  *See* Ex. B, ¶¶ 2, 5, 6.  Amgen maintained control of the sale of its WBCGF and RBCGF drugs by requiring that the ultimate cost paid for those drugs was solely based on direct negotiations and contracts between Amgen and Plaintiff and the class.

Amgen created its illegal tying scheme and did not allow wholesalers any control over the sales process so that it could maintain complete control over all the crucial elements and terms of the sales transactions of its RBCGF and WBCGF drugs to Plaintiff and the class.  Since Amgen maintained such control, Plaintiff is the *only* direct purchaser, as it is the only purchaser that was *harmed* by Amgen's illegal tying scheme.  This is a far cry from the distribution chain described in *Illinois Brick*, whereby a manufacturer relinquished control of a product after it sold the product to a wholesaler, who then re-sold it to the plaintiff.  *See Mercedes*, 364 F. Supp.2d at 480; *Doe*, 2009 WL 1423378, at *7-8.

Thus, in reality, these transactions are not like the transaction in *Illinois Brick*, where the manufacturer sold blocks to masonry contractors, who then, in a separate transaction, sold the blocks to a general contractor, who then, in another separate transaction, sold a building constructed with the blocks to the plaintiff.  Unlike *Illinois Brick* and virtually all the other cases Amgen cited where plaintiffs were barred from suing the defendant for an antitrust violation,[7] *Amgen maintained direct control of Plaintiff's purchases and effective price of RBCGF and WBCGF drugs, and utilized*

---

[7] The following cases cited by Amgen involved plaintiffs that purchased a product at issue from an entity other than the manufacturer, and had no direct interactions with the manufacturer.  *See Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1978); *Merican, Inc. v. Catepiller Tractor Co.*, 713 F.2d 958 (3d Cir. 1983); *Link v. Mercedes-Benz of N.A., Inc.*, 788 F.2d 918, 930 (3d Cir. 1986); *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842 (3d Cir. 1996), *cert. denied*, 519 U.S. 825; *Howard Hess Dental Labs, Inc. v. Dentsply Int"l, Inc.*, 424 F.3d 363 (3d Cir. 2005).

*AmerisourceBergen to attempt to thwart any potential antitrust liability from direct*

*purchasers under Illinois Brick.*

Evidence of Amgen's control over Plaintiff's purchases of RBCGF and WBCGF

drugs, as distinct from the manufacturers in *Illinois Brick* and the other cases cited by

Amgen, is evident from the facts of this case. First, the declaration of Murray Marsh

makes clear that the relationship between Amgen and Plaintiff was that of a manufacturer

and direct purchaser. *See* Ex. B, ¶¶ 2-6, Ex. A, ¶ 13. For example:

- The contracts between Plaintiff and Amgen were negotiated at Warren General Hospital between Plaintiff and an Amgen representative who continued to service the account.

- Amgen required that Plaintiff negotiate the rebates for both its RBCGF and WBCGF drugs exclusively with Amgen, which affected the ultimate price of the drugs, and had to communicate directly with Amgen to determine what the costs for those drugs would be.

- Both the wholesale acquisition cost and rebate amount for its WBCGF and RBCGF drugs were set solely by Amgen. *See In re AWP*, 491 F. Supp.2d. 20, 36 (D. Mass. 2007) and Enhanced Momentum II Contract, dated March 31, 2005, attached hereto as Ex. D.

- All rebates were paid directly to the Plaintiff by Amgen.

Thus, that Plaintiff and Amgen had direct interactions and contracts between them

regarding Plaintiff's purchases of RBCGF and WBCGF drugs, and that Amgen directly

paid all rebates to Plaintiff, without any involvement of AmerisourceBergen, completely

distinguishes Plaintiff from *Illinois Brick*'s indirect purchaser, which had absolutely no

contact with the manufacturer, and no influence in setting the price it paid for the

product.

Second, pursuant to the same illegal tying scheme, Amgen was sued by its

competitor Ortho in 2005. In Amgen's Answer and Affirmative Defenses to Ortho's

Complaint, filed in this court on November 15, 2005, Amgen made numerous admissions

that rebut facts alleged in its own current Motion to Dismiss and overwhelmingly support

Plaintiff's status as a direct purchaser.  For example:

- "Amgen admits that *gross sales of RBCGF drugs to the United States Oncology clinics* for Procrit and Aranesp are projected to exceed $2.8 billion in 2005." *See* Ex. C, ¶ 23.  (Emphasis Added).

- "Amgen admits that many clinics engaged in the treatment of cancer patients *buy WBCGF drugs from Amgen.*" *See* Ex. C, ¶ 28.  (Emphasis Added).  Amgen did not assert that a wholesaler purchases the drugs from Amgen and resells them to the clinics.

- "Amgen admits that during the Spring of 2004 it *offered discounts on its RBCGF and WBCGF drugs to providers and purchasers* under the Amgen Portfolio Contract ("APC"), and that *numerous providers and purchasers availed themselves of those discounts.*"  *See* Ex. C, ¶ 30.  (Emphasis Added). As the APC was entered into with doctors, hospitals and clinics (*See* Ex. K), Amgen was clearly referencing class members when it used the words "providers" and "purchasers."

- "Amgen further admits that under the 2005 Medicare reimbursement formula for physician-administered drugs provided in the office setting, the amount of reimbursement is based on the Average Sale Price (ASP) that reflects the average sales price for that drug *to most commercial providers and purchasers, including hospitals and retail outlets…*"  *See* Ex. C, ¶ 49. (Emphasis Added).

- "Amgen admits that [its own] audit deems all sales of Epogen and Procrit to oncology clinics as belonging to Ortho."  *See* Ex. C, ¶ 77.  Thus, Amgen's internal audit, done for the purpose of determining its own internal calculations, counts sales to clinics, not sales to wholesalers or sales to GPOs.

- "Amgen admits that sales of WBCGF drugs are separate and distinct from sales of RBCGF drugs, *which are sold to different types of customers such as oncology clinics, hospitals*, etc." *See* Ex. C, ¶ 86. (Emphasis Added).

Nowhere in Amgen's admissions does it state that a "wholesaler" purchased the

drugs, that it offered discounts to "wholesalers," or that its ASP reflects the average sale

price of that drug to a "wholesaler."  Rather, in each of these situations, Amgen considered hospitals, doctors and clinics to be its direct purchasers.

Third, documents Amgen provided to Plaintiff and class members further confirm that Plaintiff's purchase of RBCGF and WBCGF drugs from Amgen are that of a direct purchaser.  For example:

- Amgen's 2004 "Physician Clinic Agreement" states that it "sets forth the terms and conditions for the *purchase* by Physician Practice."  *See* Ex. F. (Emphasis Added).  This same agreement also provided that the determination of which of the Physician Practices' satellite offices were included within the agreement was based on "Amgen's customer classification policies," which establishes that Amgen considered the signatories to its contracts, *i.e.*, Plaintiff and class members, to be "customers" subject to its policies.  *See* id. at ¶ 2.

- Amgen's 2008 "Physician Clinic Agreement" also stated that any conflict between its Agreement with physician clinics "and any purchase order or invoice" (whether from Amgen or a wholesaler) was controlled by the Agreement.  *See* Ex. G.  Thus, for sales of Amgen's RBCGF and WBCGF drugs, its agreements with Plaintiff and the class superseded any other agreements.

- A February 20, 2007 letter from Amgen to CMS (Centers for Medicare and Medicaid Services) discussing a proposed rule regarding bundling included an Attachment A called "Setting the Record Straight about Amgen's Contracts and Allegations by J&J."  In this document, Amgen conceded that it actively set the price and rebates for its RBCGF and WBCGF drugs for its customers and stated that (1) "Amgen offers *price reduction incentives to customers in the oncology office setting* under the Amgen Portfolio Contract" and (2) "Amgen's multiproduct contract offers price concessions, *including a discount and a rebate to Neulasta and Neupogen customers*."  Amgen also confirmed that it then *manipulated the price and rebates for its customers*, based on known reimbursement levels to increase sales of its drugs when it used "the practice of giving the best discounts to the best customers."  *See* Ex. H, pp. 2-4.  (Emphasis Added).

- In a January 2007 letter sent by Amgen's Executive Director of Contracts and Pricing to class members such as doctors, clinics, and hospitals, Amgen referred to them as "*valued customer[s]*."  *See* Ex. I.  (Emphasis Added).

Most strikingly, the very contract that Amgen used in its brief to argue that "Amgen's RBCGF and WBCGF drugs are sold to wholesalers who then sell these drugs to hospitals and oncology clinics" (*See* Def. Br. at 2 and Amgen's Exhibit B) actually proves that Plaintiff and the class members are direct purchasers of the drugs.  For example, Amgen referenced its APC 2004 Template Contract between Amgen and a sample clinic, which is replete with references that prove that class members were direct purchasers, and treated as such.  The contract states:

- "Physician Practice referenced above…an Eligible Physician Practice…has engaged Purchasing Group as an exclusive agent to provide *purchasing opportunities for its eligible members.*" (Emphasis Added).

- "*Participating Eligible Physician Practice may be eligible to receive rebates on its Qualified Net Purchases of Aranesp, Neupogen and Neulasta purchased under this Letter Agreement* during the period commencing on the Date of Entry into the Program…provided *Participating Eligible Physician Practice purchases a minimum combined aggregate gross purchase dollar volume* of Aranesp, Neupogen, and Neulasta…during the applicable calendar quarter of the Amgen Portfolio Period ("Quarterly Measurement Periods"), *in accordance with the terms set forth in this Letter Agreement* (the "Amgen Portfolio Rebates").  (Emphasis Added).

- "Participating Eligible Physician Practice's combined aggregate gross purchases of Aranesp, Neupogen, and Neulasta, measured at the prevailing WAP in effect at the time of purchase….must equal or exceed (Family _6_mos_Tier_3), irrespective of the Date of Entry into the Program, *in order for Participating Eligible Physician Practice to be eligible to earn Amgen Portfolio Rebates in accordance with the Enhanced Amgen Portfolio Rebate Schedule…*" *See* p. 3 (Emphasis Added).

- "Amgen may, in its sole discretion, upon 15 days notice….(a) terminate this Letter Agreement, or (b) *reasonably modify any pricing  or discount terms contained herein*" in its "Compliance with Health Care Pricing Legislation and Statutes."  *See* p. 4. (Emphasis Added).

- "By signing this Letter Agreement, Participating Eligible Physician Practice further acknowledges that it has read, understands and agrees to

all of the terms and conditions under the Amgen Portfolio Rebate Program and the Group Purchasing Agreement." *See* p. 5.

Amgen's "template contract" bolsters Plaintiff's and class members' status as direct purchasers.  The contract is directly with class members, continuously defines class members as purchasers of RBCGF and WBCGF drugs, and recognizes that all rebate dollars flow directly from Amgen to class members.  Amgen also asserts its right to modify the pricing and discount terms, or terminate the contract.  Thus, Amgen's own exhibit offers convincing proof that Amgen retains control over Plaintiff and class members' purchase of RBCGF and WBCGF drugs, an important factor absent in *Illinois Brick*.

Amgen's references in its brief to the Enhanced Momentum II Template Contract fail to establish that Plaintiff and the class are not direct purchasers.  *See* Def. Br. at 12.  At best, they highlight the fact-specific analysis needed for this Court to determine, as a matter of law on the original pleadings, the standing issue.  Furthermore, while Amgen's cites are taken from the contract, *this is not what really happened in practice*.  While Amgen attempted to use AmerisourceBergen as a means to break the direct purchaser relationship with Plaintiff, in actuality Amgen controlled all the material terms related to the sale of WBCGF and RBCGF drugs to Plaintiff and the class.  Amgen's degree of control over those sales, a factor absent in *Illinois Brick*, along with its contractual relationship with Plaintiff, establish that WBCGF and RBCGF drug sales transactions between Plaintiff and Amgen were those of a direct purchaser nature.  As the saying goes, "if it looks like a duck, walks like a duck and quacks like a duck, it most likely is a duck."

Here, everything about the sales transactions and relationship between Amgen and the Plaintiff, including how Amgen treated and referred to Plaintiff and class members, resembles that of a direct purchaser purchasing a product from a manufacturer. While Amgen used AmerisourceBergen in an attempt to insulate itself from this very type of antitrust case, Plaintiff and class members are clearly direct purchasers of RBCGF and WBCGF drugs from Amgen.

### 3. Amgen does not cite to any precedential case law to support its claim that Plaintiff is not a Direct Purchaser.

Amgen relies on *Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2006), for the proposition that the Plaintiff and class members are indirect purchasers of Amgen's RBCGF and WBCGF drugs. Nevertheless, *Delaware Valley* is completely distinguishable from this case, mainly due to the nature of the claims against each respective defendant, and how the different antitrust violations affected the plaintiffs.

In the instant matter, Plaintiff has asserted an unlawful tying claim against Amgen. As contained in Amgen's contract with the Plaintiff, Amgen economically forced Plaintiff to purchase Aranesp so that it could also purchase Neulasta and Neupogen at prices that would allow Plaintiff to avoid losing money every time it was required to administer life saving WBCGF drugs to cancer patients. Consequently, the harm to Plaintiff stems not from the mere purchase of drugs with inflated prices, but from Amgen's scheme tying the purchase of those drugs together. The unlawful tie causing the harm was directed only at Plaintiff and the class; AmerisourceBergen was not affected by the illegal tie, as it was not economically forced to purchase Aranesp to avoid losing money on its purchases of Neulasta and Neupogen.

This case is quite different from *Delaware Valley*, where plaintiffs asserted unreasonable restraint of trade, exclusive dealing and monopoly claims, but no illegal tying claim. *See id.* Thus, the alleged harm resulting from the antitrust violations, artificially inflated prices, affected both the wholesaler and the plaintiffs, as both purchased the higher-priced good. Here, the antitrust injury stems from the illegal tie, the details of which Amgen calculated and revised based on its analysis of how its own rebate structure measured against the Medicare and other payors' reimbursement schedules. *See* Ex. A, ¶¶ 28, 30, 31, 32, 37, 51, 55-58. For example, in ¶ 30, Plaintiff alleged:

> Put another way, if Plaintiff and the class did not purchase enough Aranesp, their rebates on Nuelasta and Nuepogen would be so low, that the reimbursement they would receive for those drugs from Medicare and other payors would be less than their costs, thus causing them to lose money. As stated above, Amgen set its targets based on its knowledge of the relevant reimbursement schedules.

Amgen's illegal tie, and the corresponding rebates and reimbursement payment schedules, injured Plaintiff and the class, but did not affect AmerisourceBergen in any way.

Plaintiff's injury argument is supported by *Sports Racing Services, Inc. v. Sports Car Club of America, Inc.*, 131 F.3d 874 (10th Cir. 1997), where the court found that "[c]ritical to a tying claim is the fact that the seller forced the buyer to purchase the tied product in order to get the tying product, but it is not critical that the buyer have purchased the tied product directly *from the seller.*" *Id.* at 887. Furthermore, the court stated that "[a]n illegal tie may be found where the seller of the tying product does not itself sell the tied product but merely requires the purchaser of the tying product to buy the tied product from a designated third party rather than from any other competitive

source that the buyer might prefer." *Id.* In *Sports Racing*, the plaintiff was not barred under *Illinois Brick* because he was "the first person with a cause of action" under the illegal tying scheme, and there was "no other person who could assert a claim for illegal tying as a purchaser." *Id.* at 889-90. Such is also the case here, where Plaintiff is the first and only entity that could assert an illegal tying claim against Amgen, and there is no other person "who could assert a claim for illegal tying as a purchaser." As such, *Delaware Valley* has no applicability to this case.

### 4. Plaintiff has standing even if the Court finds that Plaintiff is an Indirect Purchaser, as the Cost-Plus Exception applies.

Even if this Court were to find that Plaintiff and class members were indirect purchasers of RBCGF and WBCGF drugs from Amgen, the cost-plus exception to *Illinois Brick* would be applicable. According to *Hanover Shoe*, the Supreme Court stated that:

> We recognize that there might be situations – for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged – where the considerations requiring that the passing-on defense not be permitted in this case would be present.

*Hanover Shoe*, 392 U.S. at 494. Furthermore, in *Illinois Brick*, the Court stated that:

> In [a cost-plus contract] situation, the [direct] purchaser is insulated from any decease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.

*Illinois Brick*, 431 U.S. at 736.

Here, the cost-plus exception would apply because the damages resulting from Amgen's tying scheme were sustained by Plaintiff and class members, as they were

economically forced to purchase Aranesp in order to avoid losing money on their essential purchases of Amgen's WBCGF drugs.  *See* Ex. A, ¶¶ 1, 7, 9. AmerisourceBergen did not sustain any damages as a result of the illegal tie. Furthermore, Plaintiff and class members negotiated directly with Amgen for rebates for Aranesp and WBCGF drugs, which determined the ultimate price of those drugs.  The wholesaler merely added on its own charge to Amgen's price, which had already been negotiated with Plaintiff.  Thus, it is a reasonable inference that Plaintiff's damages were unaffected by the wholesaler's add-on charge.[8]  Thus, Plaintiff and class members' damages are ascertainable without having to reconstruct AmerisourceBergen's probable competitive market response to the violation.  Thus, AmerisourceBergen was insulated from any decrease in sales or profit.

### C.  Amgen's Motion to Strike Plaintiff's allegations regarding the overcharge on the alleged tied product should be denied.

Amgen's request to have certain allegations stricken from the complaint should also be denied because there is nothing "redundant, immaterial, impertinent, or scandalous" about those allegations.  Fed. R. Civ. P. 12(f).  Plaintiff pled two alternative damages theories, as it is permitted to do at this stage.  *See, e.g., Myers v. MedQuist, Inc.*, No. 05 CV 4608, 2006 WL 3751210, at *8 (D. N.J. December 20, 2006) ("Rule 8(e)(2), Fed.R.Civ.P., specifically allows a plaintiff to plead in the alternative and allege parallel theories of recovery.").  As this Court noted when discussing the appropriate measure of damages in tying cases, "the law in this area is unsettled, and the issue has not been addressed by the Third Circuit Court of Appeals…."  *Sheet Metal Workers National Health Fund v. Amgen Inc.*, Civ. A. No. 07-5295, 2008 WL 3833577, at *6 (D. N.J. Aug.

---

[8] Moreover, in order to completely control its illegal tie, Amgen also controlled the amount of any add-on charge imposed by wholesalers.

13, 2008).  Given this uncertainty and the sufficiency of Plaintiff's allegations under
either damages approach, no purpose would be served by granting the motion to strike.

As explained in the case on which Amgen itself relies, motions to strike are
highly disfavored and are a "drastic remedy to be resorted to only when required for the
purposes of justice." *Tonka Corp. v. Rose Art Indus.*, 836 F. Supp. 200, 217 (D. N.J.
1993) (quotation and citation omitted).  "[O]nly allegations that are so unrelated to
plaintiffs' claims as to be unworthy of any consideration should be stricken." *Eisai Co.,
Ltd. v. Teva Pharmaceuticals USA, Inc.*, 629 F. Supp.2d 416, 425 (D. N.J. 2009).  A
motion to strike may only be granted "when the defect is plain." *Morgan Home
Fashions, Inc. v. UTI, U.S., Inc.*, No. 03-cv-0772, 2004 WL 1950370 at *8 (D. N.J. Feb.
9, 2004).  It may not be granted when, as here, it is being "used as a vehicle to determine
[a] disputed and substantial question[] of law." *Bristol-Myers Squibb Co. v. Ivax Corp.*,
77 F. Supp.2d 606, 619 (D. N.J. 2000).

"Courts do not grant motions to strike unless the moving party shows that the
allegations have no possible relation to the controversy and may cause prejudice to one of
the parties, or if the allegations confuse the issues." *Eisai*, 629 F. Supp.2d at 425.  Yet
Amgen has not even articulated – let alone demonstrated – how those allegations that
relate to the tied product approach will cause it prejudice or confuse the issues (and it
should not be permitted to attempt to do so for the first time on reply).  Amgen relies
solely on the fact that this Court in *Sheet Metal Workers* declined to allow the tied
product approach.  That, on its own, says nothing about whether the allegations will
cause prejudice to Amgen or confuse issues.  It certainly does not require this Court's use
of such an extraordinary power.

Moreover, Amgen's motion to dismiss posits a string-cite of paragraphs which contain allegations that have nothing to do with the subject matter they are seeking to have stricken from complaint. *See*, *e.g.*, Ex. A, ¶ 53 ("Amgen's continuing tying scheme caused anti-competitive effects in the RBCGF market.  Amgen economically coerced direct purchasers such as hospitals, doctors and oncology clinics into purchasing their RBCGF product, Aranesp, as a condition for receiving substantial rebates on the WBCGF drugs.").  Amgen does not even attempt to highlight which parts of those paragraphs are offensive to them.  If the Court grants Amgen's motion, Plaintiff will be unfairly prejudiced with no alleviation of prejudice to Amgen and no simplification of issues.  Indeed, by eradicating important and relevant allegations, such a piecemeal cropping of large portions of Plaintiff's carefully-crafted complaint will likely serve to confuse issues rather than simplify them.

Unlike in *Sheet Metal Workers*, in which the plaintiff based its claim solely on the tied product approach, here Plaintiff alleges both the tied product approach and the package approach.  *Compare* Ex. A, ¶¶ 4, 7 *with Sheet Metal Workers*, 2008 WL 3833577, at *6.  Thus, the complaint is sufficient regardless of which theories are ultimately upheld by the Third Circuit, and Amgen's motion to strike should be denied.

## V.    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court

deny Amgen's Motion to Dismiss the Complaint and Motion to Strike Certain

Allegations in the Complaint.


**DATED:** January 15, 2010                          BY: _s/Jeffrey J. Corrigan_____
                                                     Jeffrey L. Kodroff
                                                     Jeffrey J. Corrigan
                                                     Mary Ann Giorno
                                                     **SPECTOR ROSEMAN**
                                                     **KODROFF & WILLIS, P.C.**
                                                     1818 Market Street, Suite 2500
                                                     Philadelphia, PA  19103
                                                     Tel: (215) 496-0300

                                                     Michael D. Hausfeld
                                                     Ralph J. Bunche
                                                     **HAUSFELD LLP**
                                                     1700 K Street, NW
                                                     Suite 650
                                                     Washington, DC 20006
                                                     Tel: (202) 540-7200

                                                     Brent W. Landau
                                                     **HAUSFELD LLP**
                                                     1604 Locust St, 2nd floor
                                                     Philadelphia, PA 19103
                                                     Tel: (215) 985.3270

                                                     John C. Murdock
                                                     Jeffrey S. Goldenberg
                                                     Todd Naylor
                                                     **MURDOCK GOLDENBERG**
                                                     **SCHNEIDER & GROH, L.P.A.**
                                                     35 East Seventh Street, Suite 600
                                                     Cincinnati, OH 45202
                                                     Tel:  (513) 345-8291

David H. Fink
**THE MILLER LAW FIRM, P.C.**
Miller Shea Building
950 West University Drive, Suite 300
Rochester, MI 48307
Tel:  (248) 841-2200

Marc Edelson
**EDELSON & ASSOCIATES, LLC**
45 W. Court Street
Doylestown, PA 18901
Tel:  (215) 230-8043

Arthur N. Bailey
**ARTHUR N. BAILEY ASSOCIATES**
111 West Second Street
Suite 4500
Jamestown, NY 14701
Tel:  (716) 664-2967