**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WARREN GENERAL HOSPITAL, on : 
behalf of itself and all others similarly : Civil Action No. 09-4935 (SRC)
situated, :
 :  **OPINION**
                              Plaintiff, :
 :
            v. :
 :
AMGEN INC., :
 :
                              Defendant. :

**CHESLER**, District Judge

      This matter comes before the Court upon the motion to dismiss the Complaint and to strike certain allegations in the Complaint, filed by Defendant Amgen Inc. ("Amgen") [docket entry 10]. Plaintiff Warren General Hospital ("Plaintiff" or "Warren General") opposes the motion. The Court has considered the papers submitted by the parties, and pursuant to Federal Rule of Civil Procedure 78, rules on the motion without oral argument. For the reasons discussed below, the Court grants Amgen's motion and dismisses the Complaint in its entirety.[1]

---

[1] In light of the dismissal of the entire Complaint, the Court does not address the portion of the motion seeking an order striking certain allegations of the Complaint.

I.      BACKGROUND

Warren General initiated this antitrust action seeking relief for Amgen's allegedly unlawful scheme of tying discounts and rebates on Amgen's White Blood Cell Growth Factor (WBCGF) products, branded as Neupogen and Neulasta, to purchases of its Red Blood Cell Growth Factor (RBCGF) product, branded as Aranesp. It filed the Complaint as a putative class action on behalf of all

> direct purchasers who purchased Aranesp, Neupogen and Neulasta through an Amgen contract, such as an APC or Momentum Rebate, Momentum II or Enhanced Momentum II contract, which tied the rebates and/or discounts received on purchases of Neupogen and Neulasta to purchases of Aranesp during the period January 1, 2003 to the present.

(Compl., ¶ 70.) The Complaint seeks damages for Amgen's alleged violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14, based on Plaintiff's view that Amgen implemented an allegedly anti-competitive pricing and sales scheme to leverage its monopoly over the WBCGF market to gain control over the RBCGF market. The relevant facts, which the Court summarizes based on the allegations of the Complaint, are as follows:

Amgen manufactures and sells two different kinds of drugs involved in treating conditions associated with chemotherapy. One of these is WBCGF. Amgen's two WBCGF products command a 98% market share of WBCGF drug sales. The other is Amgen's RBCGF drug known as Aranesp. Aranesp competes with only one other RBCGF drug. The competitor RBCGF drug is manufactured by Ortho Biotech Products, L.P. and sold under the brand name Procrit. Both WBCGF and RBCGF drugs are needed to treat cancer patients.

Warren General purchased both Amgen's WBCGF products and the RBCGF drug, Aranesp, during the class period.  Warren General and other end users of the drugs transacted their purchases from Amgen pursuant to contracts identified in the Complaint as the Amgen Portfolio Contract ("APC"), Momentum Rebate, Momentum II and Enhanced Momentum II.[2] (Compl., ¶ 27.)   The contracts are negotiated by a Group Purchasing Organization ("GPO") on behalf of member hospitals.[3]   The Enhanced Momentum II contract, pursuant to which Warren General made purchases, structures the transaction so that Amgen sells Aranesp, Neupogen and

---

[2] The Court notes, for the sake of clarity, that APCs apply to oncology clinics, whereas the Momentum contracts pertain to hospital customers.  The Court also notes that the parties agree that, as documents explicitly referred to and relied on by the Complaint, the contracts may be considered by the Court on this motion to dismiss, even though the documents are extraneous to the Complaint.  In re Burlington Coast Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997); Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).

[3] Plaintiff's Opposition Brief defines GPOs as "organizations that negotiate standardized contracts with manufacturers and suppliers of medical devices on behalf of their members."  Pl. Br. at 25 (quoting Natchitoches Parish Hosp. Svc. Dist. v. Tyco Int'l Ltd., 247 F.R.D. 253, 256 (D.Mass. 2008)).  According to the helpful description of GPOs provided by the court in Natchitoches,

> GPOs pool the purchasing power of their members and leverage that power to negotiate lower prices. GPOs do not purchase any products, nor do they sign or otherwise enter into the contracts that they negotiate on behalf of their members. Instead, GPOs negotiate standard form, or model, contracts that the members themselves sign and enter into with manufacturers.

Id.

Neulasta to wholesalers, which in turn sell to hospitals.  Plaintiff acknowledges in its brief that it purchased through wholesaler Amerisource Bergen.[4]

Plaintiff alleges that Amgen offered substantial rebates to end user purchasers, such as Warren General, on the condition that they reach certain dollar volume requirements in their combined purchases of Amgen's RBCGF and WBCGF drugs.  Under Amgen's pricing scheme, each account was given dollar volume usage targets that, once reached, allowed the clinic to earn a specified level of rebate.  The greater the purchases of Amgen products, the greater the rebate earned.  To obtain sufficient rebates on their WBCGF purchases and avoid losing money on the drugs, purchasers had to meet their dollar volume targets on Aranesp.  The Complaint alleges that Amgen set the purchasing requirements and rebate levels knowing how the purchasers would be reimbursed for their WBCGF drugs by Medicare.  It alleges that Amgen knew that "[a]bsent achieving the Aranesp purchase requirements, and thereby obtaining the highest possible rebates from Amgen, Plaintiff and the class would be reimbursed by Medicare less than the cost of the WBCGF drugs."  (Compl., ¶ 31.)

The Complaint alleges that the rebate and pricing scheme forced purchasers to buy less Procrit (the competing RBCGF drug) and more Aranesp in order to attain the higher rebates.  It further alleges that these rebates were essential to end users to avoid losing money on the reimbursement they received from Medicare for administering Amgen's WBCGF drugs.  Warren General contends that even though Aranesp had a higher list and acquisition price per dose than Procrit, its only viable option was to purchase all or nearly all of its RBCGF drugs from Amgen.

---

[4] The name of Plaintiff's wholesaler does not appear in the Complaint, but the Court takes judicial notice of it for the factual narrative of this Opinion.

According to the Complaint, this allegedly illegal tying scheme caused market share for Aranesp to grow and the competitor's market share to drop. Plaintiff claims, in sum, that

> Amgen's efforts to use its monopoly power in the WBCGF drug market to coerce direct purchasers such as hospitals, doctors and oncology clinics into buying substantial amounts of Aranesp caused those purchasers to substantially overpay for RBCGF drugs, 1) to avoid losing money on their essential purchases of Amgen's WBCGF drugs, as well as 2) causing overpayments on those purchasers' bundle of combined RBCGF and WBCGF drugs, and 3) because Amgen's illegal tying scheme impaired and foreclosed Ortho's ability to effectively compete in the RBCGF market, which would have led to lower prices on RBCGF drugs, and finally 4) because Aranesp was more expensive per dose than Procrit.

(Compl., ¶ 60.)

## II.  DISCUSSION

### A.  Standard of Review

Amgen's principal basis for seeking dismissal of the Complaint in its entirety is Warren General's lack of antitrust standing as an indirect purchaser. Because Amgen has challenged Plaintiff's statutory standing to bring this suit, the Court reviews the motion to dismiss according to the standards applicable to Federal Rule of Civil Procedure 12(b)(6). Maio v. Aetna, Inc., 221 F.3d 472, 482 n. 7 (3d Cir. 2000).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims have facial plausibility. Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007). This means that the Complaint must contain sufficient factual allegations to raise a right to relief above the speculative level,

assuming the factual allegations are true.  Id. at 1965; Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).  The Supreme Court has made clear that "a formulaic recitation of the elements of a cause of action will not do."  Twombly, 127 S.Ct. at 1964-65; see also Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon those documents.  See Pension Benefit Guar. Corp., 998 F.2d at 1196.  The issue before the Court "is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims."  Burlington Coat Factory Sec. Litig., 114 F.3d at 1420 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

### B. Standing under Illinois Brick

Plaintiff claims it has been injured by the subject tying arrangement, in violation of federal antitrust laws and accordingly seeks damages from Amgen.  Section 4 of the Clayton Act, 15 U.S.C. § 15, authorizes any person injured by a violation of the antitrust laws to sue for treble damages, costs and attorneys' fees.  It is, however, well-established under the rule known as the Illinois Brick doctrine, that only direct purchasers have standing under § 4 of the Clayton Act to seek damages for antitrust violations.  Illinois Brick Co. v. Illinois, 431 U.S. 720, 735 (1977); see also Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 494 (1968) (holding that direct purchaser is injured under Section 4 of Clayton Act by full amount of overcharge and foreclosing antitrust defendant from defending on grounds that overcharge was passed on to

indirect purchasers).  With very few and narrowly tailored exceptions, a party that has made a purchase indirectly through a middleman, rather than directly from the manufacturer accused of committing an antitrust violation, is barred under Illinois Brick from bring suit.  Kansas v. Utilicorp United, Inc., 497 U.S. 199, 207 (1990).  The Supreme Court has identified three rationales for the direct purchaser rule of Illinois Brick: (1) it eliminates the complications of apportioning overcharges among purchasers in a chain of distribution, which is especially difficult in light of the wide range of considerations influencing a company's pricing decisions; (2) it eliminates a pass-on defense for manufacturers, which would reduce the effectiveness of Section 4 actions by diminishing the recovery available to a plaintiff; and (3) it eliminates the risk of multiple recoveries. Id. at 206-207, 212.

In this case, there is no question that Warren General purchased Amgen's WBCGF and RBCGF from a middleman wholesaler.  Its allegations throughout the Complaint that it is a "direct purchaser" merely parrots the Illinois Brick requirement, without providing any factual basis to support this assertions.  The Court need not assume the truth of legal conclusions.  Iqbal, 129 S.Ct. at 1949 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  In fact, the Complaint's characterization of Warren General as a direct purchaser is squarely contradicted by the purchase contracts on which the Complaint relies, which demonstrate that Warren General pays a wholesaler, not Amgen for the products based on prices which have been set by the wholesaler.  When there is a disparity between a complaint's allegations and the written instruments on which the allegations or claims

are based, the written instrument controls.  ALA, Inc. v. CCAir, Inc., 29 F.3d 855, 859 n.8 (3d Cir. 1994).[5]

Warren General acknowledges that it purchases the Amgen WBCGF and RBCGF products from a wholesaler.  It nevertheless argues that the mechanics of the transaction should not bar its antitrust action because insofar as the antitrust injury is concerned, the wholesaler is irrelevant and Warren General should be deemed the direct purchaser.  It contends that the challenged tying arrangement does not implicate any overcharge experienced by the wholesaler but rather centers on the availability of rebates to the end user.  Those rebates are negotiated directly between Amgen and the GPO to which Warren General belongs, and the purchases are made pursuant to the hospital's GPO-negotiated contract with Amgen.  The rebates are then payable directly from Amgen to Warren General.  Warren General maintains that although the transactions are structured so that the WBCGF and RBCGF products are purchased from Amgen by wholesaler Amerisource Bergen, which in turn sells them to the hospital, the crux of antitrust injury lies in the volume of RBCGF Warren General and other end users are forced to make to qualify for the rebates on WBCGF.  Thus, Plaintiff argues that it should not be subject to a

---

[5] In an attempt to establish that it is a direct purchaser, Warren General also points out that Amgen has admitted, through pleadings publicly filed in other lawsuits, that many clinics buy WBCGF from Amgen.  This argument is unavailing.  First, that a hospital or clinic buys from Amgen does not necessarily mean it purchases the product directly from the manufacturer, as opposed to somewhere along the distribution chain.  Second, the relationship between Amgen and "many clinics" or other unidentified end users is simply irrelevant.  The question the Court must address is whether the Plaintiff in this case, Warren General, has alleged facts in support of its claim that it is a direct purchaser of RBCGF and WBCGF from Amgen.  It is well-established that bringing a lawsuit as a class action does not dispense with the requirement that a named plaintiff must itself have standing to sue. Lewis v. Casey, 518 U.S. 343, 357 (1996); O'Shea v. Littleton, 414 U.S. 488, 494 (1974); Winer Family Trust v. Queen, 503 F.3d 319, 326 (3d Cir. 2007).

hypertechnical application of Illinois Brick because it bears the antitrust overcharge in the first instance.  In other words, according to Warren General, the wholesaler is completely unaffected by the tying scheme and thus Amgen would not face the risk of additional lawsuits brought by Amerisource Bergen or any other wholesaler.

Essentially, Warren General asks this Court to carve out an exception from the Illinois Brick doctrine to accommodate a business arrangement in which, according to Plaintiff's argument, the end user alone bears the tying scheme overcharge and the middleman could not have an antitrust claim.  The Court declines to do so.  Warren General has cited no authority in which either the Supreme Court, the Third Circuit, or any other court of appeals has recognized an exception for situations involving direct interaction between an indirect purchaser and the manufacturer.

Indeed, the antitrust jurisprudence indicates that courts are loath to recognize exceptions to the Illinois Brick doctrine.  See, e.g., UtiliCorp United Inc., 497 U.S. at 208 (refusing to create exception for situation in which middleman passed on entire overcharge to indirect purchaser); Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson, 523 F.3d 1116, 1123-24 (9th Cir. 2008) (holding that, under Illinois Brick rule, hospital that bought medical supplies from distributor lacked standing, even though price paid by hospital was set partly by GPO-negotiated agreement with manufacturer).  The Court acknowledges that this is not a situation in which there appears to be particular difficulty in apportioning the alleged overcharge borne by the indirect purchaser.  The Supreme Court, however, has held that for the direct purchaser rule of Illinois Brick to serve its purpose of maintaining stability and avoiding extensive fact-based litigation in antitrust suits, it must be applied as a bright-line rule, even if the rule's rationales are

not significantly furthered in a particular case. UltiliCorp United Inc., 497 U.S. at 211-12, 216. It expressly rejected adopting an approach to Illinois Brick that would create exceptions to fit the peculiarities of certain markets or business arrangements. Id. at 210-11.   The Supreme Court reasoned:

> The rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases. We nonetheless believe that ample justification exists for our stated decision not to "carve out exceptions to the [direct purchaser] rule for particular types of markets." The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule. As we have stated:
>
> "[T]he process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum would entail the very problems that the *Hanover Shoe* rule was meant to avoid. The litigation over where the line should be drawn in a particular class of cases would inject the same 'massive evidence and complicated theories' into treble-damages proceedings, albeit at a somewhat higher level of generality."
>
> In sum, even assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions. Having stated the rule in *Hanover Shoe*, and adhered to it in *Illinois Brick*, we stand by our interpretation of § 4.

Id. at 216-217 (quoting Illinois Brick, 431 U.S., at 744-745) (citations omitted).

Guided in large part by the Supreme Court's reasoning in UtiliCorp United, the Ninth Circuit refused to carve out an exception for an indirect purchaser hospital in Delaware Valley, a case which is factually similar to the one at bar. Delaware Valley Surgical Supply, Inc., 523 F.3d at 1123-24.  The case involved allegations that the defendant manufacturer Johnson & Johnson had impermissibly leveraged its monopoly power in sutures to create a monopoly in the market for endomechanical products by offering rebates and discounts on the condition that a buyer

10

purchase the bulk of both kinds of products from Johnson & Johnson.  Id. at 1118.  The plaintiff hospital, Bamberg County Memorial Hospital and Nursing Center ("Bamberg Hospital"), urged the court to adopt a new exception to Illinois Brick that would, in the hospital's view, be "better attuned to the business relationships between health care providers and manufacturers."  Id. at 1123.  The hospital did not dispute that it placed orders for medical supplies through independent distributors.  Id. at 1122.  It argued that it was nevertheless the direct victim of the manufacturer's antitrust violations and resulting artificially high prices because the hospital's GPO had negotiated the price with the manufacturer and the injury stemmed from the GPO-negotiated contract between Bamberg Hospital and the manufacturer.  Id. at 1122-23.  Bamberg Hospital further argued that it would have a greater incentive than a distributor to bring an antitrust claim based on a manufacturer's price negotiations with a GPO.  Id. at 1123.  The Delaware Valley court held that the established and deliberately strict rule under Illinois Brick did not permit the Court to deviate from the rule in consideration of the facts of the subject transaction.  Id. at 1123-24.  "The Court's firm rule does not provide us the leeway to make a policy determination on a case-by-case basis as to whether standing should be recognized when there are special business arrangements."  Id. at 1124 (citing Illinois Brick, 431 U.S. at 744).

     Despite Warren General's arguments to the contrary, the Third Circuit adheres to Illinois Brick's bright-line rule barring indirect purchasers from pursuing damages for federal antitrust violations.  Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 258-59 (3d Cir. 2010); see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 424 F.3d 363, 371 (3d Cir. 2005) (observing that Supreme Court has held that absence of an Illinois Brick concern in an

individual case does not warrant removing the bar on indirect purchaser claim); McCarthy v. Recordex Svc., Inc., 80 F.3d 842, 849-854 (3d Cir. 1996) (discussing various cases in which Third Circuit applied Illinois Brick rule).  The Court has considered Warren General's position that an Illinois Brick exception makes sense in the factual scenario presented by this case because, among other reasons, recognizing Warren General's standing "will serve to promote 'the vigorous enforcement of antitrust laws'" whereas the middleman wholesaler lacks any incentive to challenge the allegedly unlawful tying arrangement.  (See Pl. Br. at 20 (quoting UtiliCorp United Inc., 214 97 U.S. at 214)).  It remains clear, however, that Warren General is an indirect purchaser of the Amgen products at issue.  Whatever the potential merits of the exception proposed by Warren General may be, this Court holds the view that such a matter is one for the Supreme Court or the Legislature to decide.

In the alternative, Warren General maintains that, even if considered an indirect purchaser, it should be permitted to proceed with the suit under the cost-plus exception to the Illinois Brick doctrine.  The Supreme Court has recognized an Illinois Brick exception for situations in which the overcharged buyer has a pre-existing cost-plus contract.  Illinois Brick, 431 U.S. at 736; Hanover Shoe, 392 U.S. at 494. The cost-plus exception applies when the customer is committed to buying a fixed quantity of the manufacturer's product regardless of price.  Illinois Brick, 431 U.S. at 736; Mid-West Paper Prods. Co. v. Continental Group, Inc., 596  F.2d 573, 577 and n.9 (3d Cir. 1979).  The Supreme Court reasoned that because the indirect purchaser's commitment to buy a fixed quantity of the product insulates the direct purchaser from market responses to the overcharge, the effect of the overcharge on the indirect

12

purchaser is not complicated by the need to recreate whether and how much of the overcharge is borne by the indirect purchaser.  Illinois Brick, 431 U.S. at 736.

Warren General's cost-plus argument is simply not applicable.  The facts alleged in the Complaint do not demonstrate or even remotely suggest that Warren General had an agreement with Amgen to purchase a fixed amount of Aranesp.  The pricing scheme described provided that Warren General had to reach a target volume of Aranesp purchases to qualify for rebates on the combined purchase of Aranesp and WBCGF drugs.  This rebate schedule, however, does not equate with a commitment by the indirect purchaser to purchase a certain amount of Aranesp, notwithstanding Warren General's position that the rebates were essential to economic viability.

Thus, the Court concludes, based on the allegations of the Complaint and the documents on which it relies, that Warren General lacks standing, as an indirect purchaser, to pursue its claims for damages against Amgen for the complained-of antitrust violations.  Accordingly, the Complaint will be dismissed pursuant to Rule 12(b)(6).

### C. Definition of Unlawful Tie

In addition to the standing deficiency discussed above, the Complaint also fails for failure to allege an unlawful tie under federal antitrust law. An essential element of a tying claim is that the sale of one product be conditioned on the sale of another. N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5-6 (1958). "Tying is selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." Gordon v. Lewistown Hosp., 423 F.3d 184, 213 (3d Cir. 2005).

In this case, Warren General's tying theory is that Amgen leveraged its control over the WBCGF market to coerce purchases of its RBCGF products and thereby drive out competition from the RBCGF market. The Complaint does not, however, allege that Amgen attempted to achieve this by conditioning the sale of WBCGF drugs on a buyer's purchase of its RBCGF product, Aranesp. Rather, the alleged coercion and improper leveraging of its monopoly (to adopt the Complaint's characterization) occurred in the form of setting target purchase amounts to earn rebates on the WBCGF drugs, without which rebates, Plaintiff maintains, Amgen knew its buyers would lose money. The Complaint alleges, in other words, that Amgen conditioned the availability of rebates and discounts on one product, the WBCGF drugs, on a buyer's purchase of another, Amgen's RBCGF drug.

Under Third Circuit law, this allegation fails to set forth the conditioned sale element of an antitrust tying claim. SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1061 n.3 (3d Cir. 1978) (observing, in dicta, that Supreme Court has defined a tie-in as "an agreement by a party to

14

sell one product but only on the condition that the buyer also purchases a different (or tied) product" (quoting N. Pac. Ry., 356 U.S. at 5)).   The Complaint neither expressly charges nor inferentially alleges that Amgen will not sell WBCGF unless a buyer also purchases Aranesp.  Amgen, rather, has created a pricing and discount scheme that a buyer may take advantage of if it buys both Amgen products.  This arrangement does not present a tying problem.  Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984) ("Where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price.").   Having failed to plead facts establishing an essential element of an antitrust tying claim, Warren General's Complaint must be dismissed.

**III.   CONCLUSION**

For the foregoing reasons, this Court will dismiss the Complaint in its entirety pursuant to Rule 12(b)(6) for Plaintiff's lack of statutory standing, and alternatively, for failure to plead a prima facie tying claim.  An appropriate form of order will be filed together with this Opinion.

           s/ Stanley R. Chesler          
          STANLEY R. CHESLER
          United States District Judge

DATED: June 7, 2010